UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
PAUL HEYWARD,

                Plaintiff,

     -against-

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-------------------------------------------------------------------X

**NOT FOR PUBLICATION**


MEMORANDUM & ORDER
CV-05-495 (NGG)

GARAUFIS, District Judge.

      Paul Heyward (the "Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), as amended, 42 U.S.C. § 1383(c)(3). The Plaintiff challenges the determination by the Commissioner of Social Security, Jo Anne B. Barnhart ("Commissioner"), denying his disability insurance application. Specifically, the Plaintiff contends that the Administrative Law Judge ("ALJ") failed to give proper weight to the Plaintiff's "consultative examiners" and that the ALJ failed to give controlling weight to the Plaintiff's treating physician. Further, the Plaintiff argues that the ALJ did not properly support his credibility findings, and that the ALJ's decision denying his claim is not supported by substantial evidence.

      Now before the court are the parties' cross-motions for judgment on the pleadings. For the reasons set forth below, the Plaintiff's motion is denied, and the Commissioner's motion is granted.

1

## I.     BACKGROUND

### A.     *Procedural History*

On October 30, 1996, the Plaintiff filed a claim for disability insurance benefits arising

from an injury that he incurred on January 27, 1984, from that date through December 31, 1991,

the date of Plaintiff's last insured period.  (Transcript of the Record ("Tr.") 110-12).  The

Plaintiff asserted that he was unable to perform full time or sedentary work as a result of the

injury.  (Tr. 115).  The Application was initially denied by the Social Security Administration

("SSA") on February 19, 1997.  (Tr. 90, 93-95).  The Commissioner determined that the Plaintiff

was not disabled and thus not entitled to benefits, noting that the medical evidence presented

showed him "unable to perform certain kinds of work," but nonetheless able to perform

sedentary work in light of his condition, age, education and experience.  (Tr. 95).  The Plaintiff

timely requested reconsideration of the decision (Tr. 96), and on May 19, 1997, the Plaintiff's

request was denied by SSA based on the same reasoning as the initial denial.  (Tr. 98-100).

On May 30, 1997, the Plaintiff timely filed a request for a hearing.  (Tr. 101).  The

hearing commenced on June 30, 1998 before ALJ Manuel Cofresi.  (Tr. 32-89).  ALJ Cofresi

issued a decision on June 21, 1999 denying the Plaintiff's application.  (Tr. 8-22).  The Plaintiff,

through counsel, appealed ALJ Cofresi's decision on June 24, 1999.  (Tr. 6-7).  The Appeals

Council affirmed the ALJ's decision and denied the Plaintiff's request for review on May 23,

2001, at which time ALJ Cofresi's decision became the final decision of the Commissioner.  (Tr.

4-5).  Subsequently, the Plaintiff filed a civil action in this district, 01-CV-4880 (CBA).  On July

16, 2002, by stipulation of all parties, the district court reversed and remanded the

Commissioner's decision for further administrative proceedings.  (Tr. 252-54).

Pursuant to the stipulation, ALJ Cofresi held a supplemental hearing on March 31, 2004. (Tr. 420-443). ALJ Cofresi issued a new decision in the matter on July 1, 2004. (Tr. 229-242). ALJ Cofresi determined that the Plaintiff was not disabled during the relevant time period from January 27, 1984 through December 31, 1991 because he was able to do sedentary work. (Id.). The Plaintiff timely appealed the decision on July 15, 2004, (Tr. 226-28), and the appeal was denied by the Appeals Council on December 28, 2004. (Tr. 223-28). The present civil suit was then timely commenced on January 20, 2005.

### B.     The Plaintiff's Personal and Employment History

The Plaintiff is a high school graduate who began employment with the New Rochelle Police Department in 1967. On January 27, 1984, he was working as a narcotics detective when he fell while executing a search warrant and injured his right ankle. He has not returned to work with the Police Department or elsewhere since that date.

### C.     The Plaintiff's Medical History

#### 1.     Relevant Medical Evidence Before December 31, 1991

After sustaining the ankle injury on January 27, 1984, the Plaintiff, who was then forty-five years old, was treated at the New Rochelle Hospital Emergency Room. At that time, he was diagnosed with having sustained a fracture of the right fibula shaft and a severe sprain of the right ankle. (Tr. 198). The Plaintiff's right ankle was placed in a molded plastic cast and he was directed not to bear weight on the ankle; he was advised to return for follow-up x-rays. (Id.). The x-rays confirmed a "diastasis with complete disruption of the distal tibial-fibular joint of the

right ankle."[1]  On February 6, 1984, the Plaintiff was admitted to New Rochelle Hospital and underwent surgical open reduction internal fixation of the ankle joint disruption, performed by Dr. Anthony S. Klein.  (Id.).  A compression screw was put across the tibia and fibula bones to compress and reduce the disruption; the screw was subsequently surgically removed on March 14, 1984.  (Tr. 198, 201-202).

The progress notes of Dr. Klein describe the Plaintiff's condition over the next few months.  (See Tr. 199).  In an entry dated April 11, 1984, Klein writes that there is "persistent swelling – edema right ankle."  (Id.).  Klein also noted that Plaintiff was ambulating with crutches at this time, that an "x-ray of the shaft of the fibula reveals the butterfly fragments in good position," and that the "fracture line [was] still quite evident."  (Id.).  In a May 2, 1984, follow-up note, Dr. Klein reported that swelling of the ankle and foot was "somewhat decreased" but that the area was "still tender at the fracture site."  (Id.).  Klein noted further:

> Restricted dorsi-flexion of ankle.  Patient needs intensive physical therapy program – to be evaluated by Jerome Gristina, M.D.  Estimate minimum 2-3 months prior to return to active duty as a police officer.

(Id.).  In a letter dated May 12, 1984 from Dr. Gristina to Dr. Klein, Dr. Gristina relayed his findings after examining the Plaintiff.  Specifically, Gristina noted that the Plaintiff's ankle remained swollen, and that the range of motion of the ankle was restricted, but that there was no sensory deficit to pin prick.  (Tr. 217).  Gristina intended to begin whirlpool and range of motion exercises with the Plaintiff.  (Id.).  On June 11, 1984, Gristina wrote to Klein that the Plaintiff was "not making progress" and that his range of motion remained restricted as it had on his first

---

[1] "Diastasis" refers to separation of two normally attached bones; and the "distal tibial-fibular" joint refers to the ankle joint.

visit with Dr. Gristina.  (Tr. 220).

Dr. Klein's next saw the Plaintiff on June 19, 1984, and his notes from that appointment indicate that there was "essentially minimal progress in physical therapy," that the swelling had diminished somewhat although the Plaintiff reported that it was still worse at the end of the day, that there was a restricted range of motion of the right ankle, and that an x-ray revealed "improvement in appearance of bone density."  (Id.).  Klein also noted on this date that he was unable to determine at that time whether the Plaintiff "will be permanently disabled as regards fulfilling his duties as a police officer."  Klein intended to wait six weeks to re-evaluate.  (Id.).

Following a July 31, 1984 visit, Dr. Klein wrote the following progress note:

> Patient has marked limitation motion right ankle.  States when he does ambulate progressive discomfort swelling which occurs [sic] during the day of activity.  X-rays reveal the fibula fracture to be well healed and the ankle mortise to be satisfactory.  However there is a narrowing of the distal tibial talar articulation on its lateral aspect.

> Mr. Heyward was advised that I believe the findings of limitation of motion, pain, and early arthritic changes will prohibit him from returning to duty as a detective with the police force.  These findings should be considered permanent and disabling in nature.

(Tr. 199).  On September 5, 1984, Dr. Gristina noted, after review of the Plaintiff's medical record at the request of Dr. Klein, that it would "certainly appear" that the Plaintiff has a "permanent to partial disability of th[e right] ankle with permanent restriction of range of motion."  (Tr. 219).  The September 17, 1984 notes of an orthopedist, Dr. Richard J. Cea, to whom the Plaintiff was referred by Dr. Klein, report that the Plaintiff's fibula fracture was healed, but that the Plaintiff's restricted range of motion persisted.  (Tr. 215).  Dr. Cea's diagnosis included "possible early traumatic arthritis developing" and noted that although

5

Plaintiff was at the time disabled from active police duty, it was "too early to classify this disability as permanent." (Id.).

Dr. Klein continued to see the Plaintiff between December 1984 and April 1985. In a progress note dated December 19, 1984, Klein notes that the swelling of Plaintiff's ankle diminished, but the restriction of motion persisted. Klein again referred the Plaintiff to Dr. Gristina for continued physical therapy. (Tr. 197). On January 18, 1985, Klein recorded that swelling is minimal, but continued restriction of motion. Klein notes that "patient to continue therapy. However, do not believe will achieve normal range of motion." (Id.). Klein's next notation, dated February 25, 1985, references an onset of "significant swelling" in the right ankle, with no change to range of motion. Klein recommended decreasing physical therapy as he felt the Plaintiff was "pushing it too hard in physical therapy." (Id.). And finally, on April 2, 1985, Klein recorded the following: "Swelling is decreased. Patient still with residual limitation, range of motion. Advised patient that findings of limitation of motion, pain, and early arthritic changes will prohibit him from returning to any duty as a detective with the police force." (Id.). Dr. Klein examined the Plaintiff again on August 19, 1985, one week after the Plaintiff's right ankle "gave way . . . causing him to lacerate left great toe." (Tr. 200).

On November 26, 1985, Dr. Joseph Francis Giattini, M.D. examined the Plaintiff for the New York State Employees' Retirement System. (See Tr. 191-93). Dr. Giattini recorded the Plaintiff's claims that he "has a great deal of pain in the right ankle and an inability to run or perform any athletic activity necessitating running or being on his feet for any length of time." (Tr. 192). Upon examination, Giattini reported no sensory or motor loss in the Plaintiff's lower extremities, and "obvious swelling" of the right ankle-foot area. (Id.). The doctor also noted

"markedly limited" rotation and eversion and "marked tenderness" in the injured area. (Id.). X-rays revealed "osteoarthritic changes involving the lateral end of the tibio-talar joint at the level of the distal talo-fibular joint." (Id.). Giattini ultimately concluded that the Plaintiff's January 27, 1984 accident was the "competent producing cause of the [Plaintiff's] present condition, that the "condition is permanent," and that the Plaintiff is unable to perform the duties of a narcotics detective as a result. (Tr. 193). On December 26, 1985, the New York State Employees' Retirement System determined that the Plaintiff was "permanently incapacitated" for his duties as a police officer and approved his application for accidental disability retirement. (Tr. 222).

The Plaintiff saw Dr. Klein again on January 17, 1986. Klein, in his notes regarding that visit, describes the Plaintiff as continuing to have "occasional swelling and discomfort" in the right ankle, with the discomfort increased by activity, restricted range of motion, limited dorsiflexion, and "great difficulty running." (Tr. 200). Klein opined that the Plaintiff "continues to be disabled as regards functioning as an active police officer." (Id.).

By letter dated May 5, 1986, Dr. Klein reported his evaluations of the Plaintiff to the New York State Department of Social Services Office of Disability Determination. (See Tr. 194-95). Klein stated that the Plaintiff underwent "aggressive and consistent physical therapy" following the initial injury, but was "unable to achieve a normal range of motion in the right ankle." (Tr. 194). Klein further noted that "various consultants . . . concurred that early arthritic changes are evolving which are causally related to the accident of 1/27/84" and that physical therapy was determined to be aggravating the condition. (Id.). Based on Klein's April 28, 1986 examination of the Plaintiff, Klein reported that the Plaintiff's right ankle was larger than his left and that he continued to experience limited and restricted range of motion in the right ankle. (Id.). Klein

concluded that the Plaintiff "is considered 100% disabled as regards his right lower extremity with respect to activities which necessitate significant amounts of ambulation, prolonged standing, running, etc." (Tr. 195).

There is no medical evidence in the record for the period between May 1986 and April 1990. On April 23, 1990, however, the Plaintiff, then fifty-one years old, was involved in a motorcycle accident, as a result of which he injured his right knee and shoulder. He was seen on that date in the emergency room of the Franklin General Medical Center. (See Tr. 156). Examination of the Plaintiff revealed no fracture in the shoulder area, but limited motion to the right shoulder "because of pain." (Tr. 156). The right knee examination showed the knee to be "normal with good stability and no effusion." (Id.). The treating doctor, an orthopaedic surgeon named Jeffrey Shapiro, further noted: "He has some pain in the area of the quadriceps. He can actively extend the leg but has some weakness and pain. There is no significant swelling of the leg. Radiographs of the femur and knee are normal." (Id.). Dr. Shapiro's diagnosis was "injury to the right shoulder with possible rotator cuff tear" and "quadriceps injury, possible partial tear or contusion on the right leg." (Id.). The Plaintiff was placed in a knee immobilizer and instructed to follow-up in five days time. (Id.). Five days later, the Plaintiff visited Dr. Shapiro again, and Shapiro determined that "it becomes apparent now that he has a significant tear to the quadriceps insertion to the patella with hematoma formation and inability to extend his knee today." (Id.). Shapiro recommended immediate emergency surgical repair. (Id.).[2]

Following the surgery to repair the right quadriceps, the Plaintiff was again seen by Dr. Klein for follow-up medical treatment and assessment. (See Tr. 158-62). On both May 11, 1990

_____

[2] The Plaintiff's shoulder injury appears to have presented no further significant problems.

and May 21, 1990, Dr. Klein's progress notes report that the Plaintiff's wound from the surgery had "healed nicely" and that he was experiencing "obvious quadricep weakness." (Tr. 162). The Plaintiff commenced range of motion and quadricep strengthening exercises through physical therapy. (Id.). On June 11, 1990, Klein reports that Plaintiff had "increasing strength" in the quadricep. (Tr. 161). On July 9, 1990, Klein similarly reported "good strength" and "good motion," and that the physical therapist recommended discontinuing therapy "as he is doing well." (Id.). At a December 7, 1990 appointment with Dr. Klein, the Plaintiff complained of popping and clicking in the right knee. Klein's examination showed "good muscle control," "good motion," and "no jointline pain." (Id.). He noted popping of the fibrous scar tissue where the surgery was performed, and stated that the Plaintiff would follow-up "on an as-needed basis" and that "no intervention is indicated." (Id.).

The Plaintiff returned to Dr. Klein approximately one year later, on November 25, 1991, presenting with pain that he said had begun four weeks prior "without a history of trauma involving the *left* knee." (Tr. 160) (emphasis added). The Plaintiff reported "pain, feelings of giving way, popping and clicking." (Id.). X-rays taken showed the left knee to be normal, and Klein diagnosed "tear of the left medical meniscus." (Id.). Klein prescribed Naprosyn, an anti-inflammatory drug used to relieve symptoms associated with arthritis. As of December 13, 1991, Klein noted that the swelling of the left knee had begun to resolve with the Naprosyn, but the Plaintiff continued to show symptoms, including mild swelling. (Id.). Dr. Klein indicated the Plaintiff for arthroscopy at the next convenient date. (Id.). In a progress note dated January 8, 1992, when the Plaintiff was pre-op for the arthroscopy, Dr. Klein noted that the Plaintiff "has a painless soft tissue swelling over the lateral aspect of his right knee." (Tr. 159). Klein took

specific note of this swelling, stating that it could be a "meniscal cyst" and recording that he would follow it to see if it becomes symptomatic or larger, and to determine whether it should be biopsied. (Id.). Following the arthroscopy, on January 20, 1992, Dr. Klein notes "evidence of osteoarthritis of [Plaintiff's] left knee." (Id).

2. *Relevant Medical Evidence After December 31, 1991*

Almost four years after the left knee arthroscopy, on October 24, 1995, the Plaintiff returned to Dr. Klein with complaints of persistent pain and swelling of the right ankle, that was "aggravated and exacerbated with attempted activity, stair climbing, etc." (Tr. 158). Klein's examination revealed a swollen right ankle with limited range of motion. Dr. Klein determined the following:

> Radiographs in my office, 3 views, right ankle, reveal degenerative arthritic changes, interosseous calcification proximal to the distal tibio-fibular joint. Some evidence of osteoarthritis within the ankle joint. Findings on x-ray confirm the limitation of movement at the ankle joint – this is secondary to the injury he sustained 1/27/84 and is causally related to it. I would consider [Plaintiff] at this time to be permanently disabled with respect to his right lower extremity."

(Id.).

The Plaintiff's next medical assessment occurred on April 14, 1997. On that date, Plaintiff re-visited Dr. Shapiro, of the Franklin General Medical Center, presenting with a "twisting injury" to his right ankle and right knee, which had occurred approximately one week prior. (Tr. 157). Plaintiff reported to Dr. Shapiro that his knee had swelled but that the swelling had diminished. Shapiro's examination demonstrated "moderate effusion" to the right knee but "no instability," and the x-ray revealed "some mild to moderate arthritic changes to the right knee." (Id). Shapiro diagnosed "osteoarthritis of the right knee, possible torn medial meniscus," prescribed Naprosyn, and referred the plaintiff for therapy. (Id). On May 5, 1997, Dr. Shapiro

noted that the Plaintiff was "feeling much better with his therapy." Specifically, Shapiro found a mild to moderate effusion persisted, but the Plaintiff has "improved motion and full extension . . . without significant pain." (Tr. 175). Shapiro recommended continued physical therapy and follow-up on an as-needed basis." (Id).

The Plaintiff next saw Dr. Shapiro on December 11, 1997, complaining of pain in the right knee "in spite of eight weeks of therapy." (Tr. 174). Shapiro scheduled an MRI for Plaintiff's right knee. He also noted the "bigger problem today" as being Plaintiff's right ankle, which was tender and stiff. (Id). Examination of the ankle showed limited mobility; x-rays showed "some mild arthritic changes." (Id). Eight days later, by telephone, Shapiro reported to the Plaintiff the results of the MRI of his right knee: "grade III posterior lateral meniscus tear and a partial ALC tear." (Id). Shapiro suggested possible arthroscopy if the pain persisted. (Id).

Beginning on January 5, 1998, the Plaintiff was seen by Dr. Shapiro's orthopaedic partner, Dr. Richard M. Bochner. (See Tr. 172-74). On that date, Dr. Bochner recommended arthroscopy for the Plaintiff's right knee due to continued pain, clicking, and swelling, and because x-rays revealed "moderate arthritic changes." (Tr. 174). Bochner explained to the Plaintiff that although arthroscopy would relieve symptoms of the medial meniscus tear he suffered, he would continue to have arthritis and might continue to have pain or swelling as a result. (Id). Arthroscopy was performed in early February of 1998. The Plaintiff was seen by Dr. Bochner for follow-up on February 9, 1998 and on March 4, 1998. (See Tr. 173). At the one-month post-operative examination, Bochner noted that the Plaintiff "is not reporting much pain, had no knee instability, and good strength." (Id). He was advised to continue home strengthening exercises and to see Dr. Bochner only as needed. (Id). In a letter dated April 27,

1998, from Dr. Bochner to the Plaintiff's attorney, Bochner summarized the Plaintiff's medical record and concluded that "the condition of [the right] knee, namely the arthritic changes, are thought to be causally related to the old injury the patient sustained while at work in 1984." (Tr. 172).

On May 26, 1998, the Plaintiff and his wife drove to West Virginia for an appointment with Frank H. Adams, a physical therapist who was referred to Plaintiff by his attorney. (See Tr. 176-81). Adams's record on the Plaintiff reveals that he reviewed the progress notes of Drs. Bochner, Shapiro, Klein and Giattini in connection with his physical examination of the Plantiff. (Tr. 179-80). Adams's assessment of the Plaintiff's condition stated as follows:

> Mr. Heyward's chief problems during the functional capacity evaluation appeared to be both knees and his right ankle. He had significant weakness, loss of range of motion, and pain which would preclude him from returning to his previous employment or for positions for which he is qualified by experience and training. He continues to be disabled regarding his functioning as an active police officer. I think his activities are restricted to strictly sedentary activities, and he would be so restricted as to preclude him from working an eight hour a day, five day per week job.

(Tr. 181). Adams assessed that the Plaintiff could sit for a maximum of fifteen minutes, stand for a maximum of fifteen minutes, lift five pounds from the floor to the waist, lift ten pounds halfway overhead, carry twenty pounds a distance of fifty feet, and push or pull twenty-five pounds approximately six feet on a thirty-one inch table. (Id.).

At the March 2004 hearing before ALJ Cofresi, a medical expert named Dr. Richard Goodman took the stand. Based upon the medical records he reviewed, Dr. Goodman testified that the Plaintiff suffered an injury to his right ankle in 1984, and went on to describe the Plaintiff's ensuing medical condition as follows:

> Following [the ankle injury], he had some problems with his ankle, and from what

I can determine, he was able to return to work although he had permanent partial disability . . . The ankle condition remained symptomatic but was not disabling or did not meet a listing. The ankle was repaired successfully despite his symptoms. We then have an accident . . . in 1990 he was in a second event and had a quadriceps injury to the knee, partial tear, which was treated conservatively with an immobilizer, and a right shoulder injury. As far as I can tell, neither one required surgical intervention. The remainder of his case is following the time period of 1991.

(Tr. 431-32). When asked if the post-1991 medical evidence was instructive of the Plaintiff's condition during the insured period before December 31, 1991, Dr. Goodman responded that the later evidence showed that during the insured period, the Plaintiff "continued to be symptomatic in his right ankle. He continued to have a limited ability to do prolonged running, standing, jumping, climbing." (Tr. 432).

### D. Non-Medical Evidence

#### 1. Plaintiff's Testimony

At the 1998 hearing, the Plaintiff testified that his right ankle was "like [a] trick knee because I be walking sometimes all of the sudden it just give out." (Tr. 46). He stated that he has fallen down the stairs of his house numerous times and that he has had "quite a few" incidents with his right ankle giving out. (Id.). He testified that he generally can sit for approximately fifteen minutes, and that his legs start swelling as soon as he gets out of bed in the morning. (Tr. 46-47). He stated that he can stand without discomfort for "maybe about 15, 20 minutes," that he has difficulty walking more than two or three blocks, and that he is unable to do stoop or bend. (Tr. 47-51). The Plaintiff testified that he has been in pain ever since his initial ankle injury in 1984, and that as a result of that injury he came to have trouble with both his left and right knees. (Tr. 49). He props his leg up on a pillow approximately twice a day to drain some of the fluid and alleviate some of his pain, but nonetheless spends most of the day lying

down watching television. (Tr. 50-51, 54). He stated that his pain lasts all day long. (Tr. 50). The Plaintiff also explained that he has difficulty lifting objects and climbing (Tr. 52-53), that he is no longer able to do any chores or housework, and that he drives only short distances. (Tr. 53-54).

The Plaintiff testified that he experiences side effects and complications from the medications he is prescribed to deal with his pain, namely Tylenol and Advil, and Naprosyn to treat his swelling. The Tylenol upsets the Plaintiff's stomach and sometimes disorients him (Tr. 48, 55), and the Naproxin similarly upsets his stomach. (Tr. 51). Moreover, these medications, in connection with high blood pressure medicine the Plaintiff also takes, interact to cause dizziness while walking. (Tr. 51, 55). The Plaintiff was asked if there was "any kind of work you think that could have done from the . . . [time] you received the injury in 1984 up until this time?" (Tr. 59). He responded that he did not believe there were jobs available that would permit him to put his leg up, and to relieve the pain and fluid as he required. (Id.).

At the Plaintiff's second hearing, in March 2004, the Plaintiff was asked to rate the level of pain he experienced after his initial injury in 1984 prior to December 31, 1991; the scale ranged from one to ten, with one being the low end. (Tr. 426). He responded that he experienced pain in the range of nine to ten during that period, and that his condition progressed "downhill" over time. (Id.). Plaintiff testified that prior to 1991, he could sit for approximately forty-five minutes at a time but then would need to elevate his right leg to reduce swelling, and that he could stand for about the same amount of time. (Tr. 427). He further testified that he could drive short distances during this time period, that he had trouble sleeping due to pain, and that he could concentrate on a thirty-minute television show "on and off" depending on his level

of pain.

### 2. *Vocational Testimony*

On May 26, 1998, the same day Plaintiff was examined by Adams, he also was evaluated in West Virginia by a vocational consultant, recommended by his attorney, by the name of Phyllis C. Shapero. (Tr. 182-87). Shapero reported the Plaintiff's recounting of his 600 mile drive to West Virginia. Plaintiff reported that his wife drove most of the distance, and that the trip took two days "because he has problems with swelling of his right knee and ankle when riding in a car." (Tr. 184). Plaintiff declared that he had to stop about "ever[y] hour or hour and a half so to get out and move around for about twenty minutes." (Id.). Shapero reported that the Plaintiff was "pleasant, friendly and was able to focus his mind and attention on my questions," that he sat with his right leg outstretched throughout the duration of their interview, and that his right knee was visibly "quite swollen." (Tr. 185).

Shapero considered the medical records of Drs. Bochner, Klein, Giattini, and Cea, and of the New Rochelle Hospital Medical Center. (Tr. 185-86). Based on these records, her interview and assessment of the Plaintiff, and consideration of the Plaintiff's age, education, training, prior work and acquired job skills, Shapero concluded that the Plaintiff "does not have the residual functional capacity to perform any type of job on a sustained basis." (Tr. 183, 187). Noting that he experiences "so much pain and swelling in his leg and ankle that he must spend much of his time in a reclining position," she stated that she "know[s] of no jobs that exist in significant numbers that such a person could perform when it is necessary to lie down for many hours during the day." (Tr. 187).

At the Plaintiff's first hearing before ALJ Cofresi in July 1998, a vocational expert named

Fred Siegel ("VE Siegel"), testified. VE Siegel explained that the Plaintiff's prior work as a detective required light exertion, and his work before that, as a police officer, required medium exertion. (Tr. 80). VE Siegel further testified that in both jobs, the Plaintiff would have acquired the transferable ability "to interview people about incidents and note significant details about them and make an analysis of them," and that he would have obtained first aid skills. (Id.). Plaintiff was also knowledgeable about police procedure and gained "the ability to write appropriate reports" as a result of his previous employment. (Id.).

The ALJ presented VE Siegel with two hypothetical scenarios. The first presented a claimant with the Plaintiff's vocational profile as of December 31, 1991 (Plaintiff's last date of insured status), i.e. age 52, with high school diploma and training as a police officer. ALJ Cofresi restricted the attributes of this hypothetical claimant with the following limitations: can walk only 2-3 blocks; sit and stand for only fifteen minutes intermittently; unable to bend, stoop or crawl; and can only drive short distances. (Tr. 81). VE Siegel testified that such a claimant would not be able to perform the jobs of either police officer or detective, and indeed would be unable to perform other types of work that utilize the skills of interviewing people, administering first aid, or report writing. (Tr. 81-82).

In the second hypothetical posed, a claimant with the same vocational profile but with the ability to perform "the full range of sedentary work" was presented. (Tr. 82). VE Siegel testified that a claimant such as the one presented in this scenario could perform three sedentary jobs. First, such a claimant could perform the job of claim clerk, which involves preparing claim reports and forms, typically for insurance companies, and obtaining information from people to make an analysis. (Id.). Second, VE Siegel stated that such a claimant could work as an

employment clerk for a security firm, which involves sedentary work of interviewing candidates for security jobs. (Tr. 83). According to VE Siegel, there are approximately 5,500 claims clerk positions in New York City, and 100,000 positions nationally. With respect to the employment clerk position, there are 350-400 such positions in New York City, and 6,000 nationally. (Id.). Finally, VE Siegel testified that working as a security clerk would be another option, which involves photographing, fingerprinting, and keeping a record of badges issued to employees. (Tr. 84). There are approximately 400 of these jobs in New York City and 7,000 nationally. (Id.).

On cross examination, VE Siegel testified that if a claimant was found to experience the limitations of being able to walk only two or three blocks, to stand only for fifteen minutes, and to be unable to sit for a period of six to eight hours, this person would not be able to perform a full range of sedentary work. (Tr. 85). Moreover, VE Siegel testified that a person found to experience the limitations noted above would not be able to perform the sedentary jobs of claim clerk, employment clerk, or security clerk. (Id.). Finally, VE Siegel testified as follows:

> Q:     Is there any job that, that the – Mr. Heyward would be able to perform
> assuming that he can only walk for a couple of blocks, stand 15 minutes,
> sit for a period of time less than six hours a day, cannot stoop or bend, and
> he needs to elevate the leg a significant portion of the day, is there any
> sedentary work that he would be able to perform?
>
> A:     My previous answer is the same. The answer is no, if the judge so finds.

(Tr. 86).

At the Plaintiff's second hearing before ALJ Cofresi, held on March 3, 2004, the parties stipulated to admitting into evidence the testimony of VE Siegel from the first hearing. (Tr. 438). At the second hearing, VE Siegel testified again, having reviewed the records of Phyllis Shapero. VE Siegel stated that he disagreed with Shapero's findings, and he expanded upon his testimony

at the first hearing concerning the possible sedentary jobs which a claimant such as plaintiff could perform.  (Tr. 439, 441-42).  He testified that the position of claims clerk would "afford the opportunity to change positions and get up for a moment."  (Tr. 441).  He stated that it would likely be "unusual," but possible, for an employee to elevate his legs for an hour at a time.  (Tr. 441-42).  VE Siegel attested that a hypothetical individual, age 52, who experiences moderate to severe pain, problems with concentration, and requires a sit-stand employment option, would not be employable.  (Tr. 442).

## II.      DISCUSSION

### A.      *Standard of Review*

The role of a district court in reviewing the Commissioner's final decision is limited.  If supported by "substantial evidence," the findings of the Commissioner as to any fact shall be conclusive.  Richardson v. Perales, 402 U.S. 389, 390 (1971).  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 401 (internal citations omitted).  "It is the function of the [Commissioner], not [the reviewing courts] to resolve evidentiary conflicts and to appraise the credibility of witnesses . . . ."  Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citation and quotation marks omitted).

### B.      *The ALJ's Decision*

To receive benefits, a claimant must be "disabled" within the meaning of the Social Security Act.  Shaw v. Chater, 221 F. 3d 126, 131 (2d Cir. 2000).  The Commissioner must utilize a five-step sequential analysis to determine whether an individual is entitled to disability benefits:

18

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.  If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

20 C.F.R. § 404.1520; Shaw, 221 F.3d at 132 (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998)).

The Commissioner may meet its burden of proof on the final step, and show that a claimant can perform other work that exists in the national economy, through the use of the Social Security Administration's ("SSA") Medical-Vocational guidelines tables ("Grid"). The Grid "provide[s] predeterminations of disability or non-disability for individual cases based on various combinations of residual functional capacity, age, education and work skill." Davis v. Shalala, 883 F. Supp. 828, 832 (E.D.N.Y. 1995).

ALJ Cofresi's decision summarized the Plaintiff's medical records of Drs. Klein, Cea, Giattini, Shapiro, and Bochner, as well as the records of Frank Adams, and the testimony of VE Siegel. (Tr. 233-38). Cofresi acknowledged his obligation to follow the five-step analytical

framework (Tr. 233), and then went on to discuss the five steps. He found that the Plaintiff has not been engaged in substantial gainful activity since his initial injury in 1984 (Tr. 234), that he suffers from a severe impairment (Tr. 238), and that this impairment is not listed in Appendix 1 of the regulations. (Tr. 238). The first three elements of the five step analysis are not in dispute.

With respect to the fourth step, ALJ Cofresi concluded that "the claimant could not return to his past relevant work prior to December 31, 1991." (Tr. 240). This conclusion is supported by substantial evidence, as nearly every doctor who treated or examined the Plaintiff determined that he could not return to his position as a police officer or detective following his ankle injury in 1984.

On the final step of the five-step analysis, ALJ Cofresi determined that the Plaintiff was "not disabled" because "evidence supports a finding that the claimant can perform the demands of the full range of sedentary work," and that "there were jobs available to the claimant that were present in significant numbers in the national economy." (Tr. 241). ALJ Cofresi noted that he was obliged, pursuant to 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p, to consider "all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. 238). He concluded, however, that the Plaintiff was not credible, finding his allegations to be "disproportionate to the record," specifically not supported by "particular findings on physical examination and the results of diagnostic testing." (Id.). According to the ALJ, following the Plaintiff's initial ankle surgery in 1984, radiological testing was negative and the Plaintiff's medical treatment was "conservative," consisting primarily of physical therapy "that was discontinued by 1986." (Id.).

The ALJ was particularly swayed by the fact that the Plaintiff received no medical

attention between early 1986 and 1990, when he was injured again in the motorcycle accident.

(Tr. 238).  Cofresi felt that the fact that the Plaintiff was riding a motorcycle in 1990 belied his

assertions that he was totally disabled at the time.  (Tr. 238).  Cofresi concluded:

> The claimant's medical treatment during the time period was conservative, and at
> time[s] non-existent.  He did [not][3] require[ ] hospitalization or surgical
> intervention between February 1984 and February 1998.  His medications have
> not been unusual for either type or dosage, and there is no indication that they
> have produced any adverse side effects.  It also appears that the claimant engaged
> in a range of daily living activities that is at odds with his description of his
> functional capacity.  By all indications he was independent in self care.  He also
> possessed a valid driver's license and operated motor vehicles.  He was doing
> exactly that (a motorcycle) when he was injured in 1990.  Given these factors, the
> claimant is not entirely credible.

(Tr. 239).

ALJ Cofresi next considered the medical opinions, i.e. "statements from acceptable

medical sources" concerning the Plaintiff's condition and physical limitations.  (Id.).  He

emphasized that none of the medical professionals who treated the Plaintiff "went so far as to

state that [he] was totally disabled."  (Id.).  He also discounted the opinions of Frank Adams and

Phyllis Shapero, both of whom concluded that the Plaintiff was effectively totally disabled and

unable to perform any type of job.  With respect to Adams, Cofresi noted that his May 1998

evaluation of the Plaintiff was performed "well after the expiration of insured status" and thus

the probative value of his opinion as to the Plaintiff's condition in 1991 was "minimal at best."

(Id.).  He also opined that Adams was not a medical doctor and that he did not have a treating

relationship with the Plaintiff, and thus his opinion is not covered by the treating physician rule.

(Id.).  Shapero's vocational assessment was likewise discredited, again because it took place over

---

[3] In the decision, ALJ Cofresi omitted the word "not" in this sentence, but it is clear from the
context of the sentence and the paragraph that this was a mistake on his part.

six years after the expiration of insured status, and because she is not a medical professional.

(Id.). ALJ Cofresi declared: "Her conclusion that the claimant's residual functional capacity is for less than a full range of sedentary work would appear to be outside her area of professional expertise and thus not binding in any way on the Undersigned." (Id.).

ALJ Cofresi came to the following determination:

> [T]he Undersigned finds that prior to December 31, 1991, the claimant retained the following residual functional capacity: the full range of sedentary work. He could sit up for up to 6 hours a day with reasonable breaks during the day, and he could lift and carry as much as 10 pounds on an occasional basis. The conclusion is based on the reports of the physicians who treated the claimant following his injuries in 1984 and 1990, all of whom found him disabled from his prior work, but no other type of work. It is also based on the lack of medical treatment between early 1986 and 1990.

(Tr. 239-40) (emphasis in original). Following this determination, ALJ Cofresi went on to find, based on the Plaintiff's age, education and vocationally relevant past work experience, and the testimony of VE Siegel, that there were jobs available in significant numbers in the national economy that the Plaintiff could perform, namely those of claims clerk, employment clerk, and security clerk. (Tr. 240-41). Thus, the Plaintiff was thus found to be not disabled and his social security claim was denied.

### C.      The Plaintiff's Claims

#### 1.      Plaintiff's Consultative Examiners

The Plaintiff's first claim is that the ALJ failed to give proper weight to the claimant's consultative examiners, Frank Adams and Phyllis Shapero. (See Pl.'s Mem. at 6-7). ALJ Cofresi discredited their opinions because their examinations were performed a number years after 1991, and because they are not medical doctors. Under 20 C.F.R. 404.1513(d)(1), the ALJ can consider evidence from other sources – i.e. non-medical sources – to show "the severity of

22

[the claimant's] impairment(s) and how it affects [the claimant's] ability to work." However, I am aware of no statutory provision, or case precedent, which brings the opinions of these sources within the purview of the treating physicians rule. In other words, ALJ Cofresi was permitted to find that these opinions were of low probative value on the question of the Plaintiff's residual functional capacity as of December 31, 1991, as he was not required to give them any special weight. See Mackey v. Barnhart, 306 F.Supp. 2d 337, 344 (E.D.N.Y. 2004) (Gershon, J.) ("The opinion of a one-time consultative examiner is entitled to less weight than that of the treating doctors.").

### 2. *Treating Physician Rule*

The Plaintiff next claims that ALJ Cofresi failed to give proper weight to the Plaintiff's treating physician, arguing that "Dr. Gristina, the claimant's treating physician, opined that the claimant would have permanent restrictions of motion." (Pl.'s Mem. at 7-8). The Plaintiff's allegation that ALJ Cofresi failed to properly follow the treating physician's rule is not supported by the record. Moreover, the Plaintiff's treating physicians themselves never classified the Plaintiff as totally disabled or unable to perform sedentary work.

The treating physician rule as articulated by the Second Circuit states that:

a treating physician's opinion on the subject of medical disability, i.e., diagnosis and nature and degree of impairment, is: (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, although resolution of genuine conflicts between the opinion of the treating physician, with its extra weight, and any substantial evidence to the contrary remains the responsibility of the fact-finder.

Havas v. Bowen, 804 F.2d 783, 785 (2d Cir. 1986) (quoting Schisler v. Heckler, 787 F.2d 76, 81 (2d Cir. 1986)). "The opinion of a treating physician is given controlling weight if it is well

supported by medical findings and not inconsistent with other substantial evidence." <u>Rosa v.</u>

<u>Callahan</u>, 168 F.3d 72, 78-79 (2d Cir.1999); 20 C.F.R. § 404.1527(d)(2). An ALJ is not bound

to an assessment by the treating physician of the Plaintiff's ability; however, an ALJ is required

to provide "good reasons" to accord the opinion other than controlling weight. <u>See</u> <u>Halloran v.</u>

<u>Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. § 416.927(d)(2). Further, if the ALJ decides

that the treating physician's opinions are not to be given controlling weight, the ALJ must specify

what "reduced weight to give them." <u>Johnson v. Apfel</u>, No. 97-CV-3442, 1998 U.S. Dist. LEXIS

9939, at *15 (E.D.N.Y. July 2, 1998). In reaching this decision, an ALJ must apply the factors

set out in 20 C.F.R. § 404.1527(d)(2)-(6), including:

> (i) the frequency of examination and the length, nature and extent of the treatment
> relationship; (ii) the evidence in support of the treating physician's opinion; (iii)
> the consistency of the opinion with the record as a whole; (iv) whether the opinion
> is from a specialist; and (v) other factors brought to the Social Security
> Administration's attention that tend to support or contradict the opinion.

<u>Halloran</u>, 362 F.3d at 32.

Although this court would not "hesitate to remand when the Commissioner . . . do[es] not

comprehensively set forth reasons for the weight assigned to a treating physician's opinion," <u>id.</u>,

it seems clear to me that ALJ Cofresi did give proper weight to the opinions of the Plaintiff's

treating physicians. Indeed, ALJ Cofresi's determination that the Plaintiff was capable as of

December 31, 1999 to perform the full range of sedentary work is consistent with all of the

medical opinions of the physicians who treated the Plaintiff. There is no question that the

Plaintiff suffered a permanent injury to his right ankle. Dr. Klein, who saw the Plaintiff

numerous times between 1984 and 1995, consistently found that the Plaintiff's range of motion

in his right ankle was restricted. (<u>See</u> Tr. 158, 197, 217, 200, 220). The Plaintiff's other doctors

confirmed the finding of permanent restricted range of motion in the right ankle. (Tr. 192 (Dr. Giattini); 217, 219-20 (Dr. Gristina)). ALJ Cofresi did not controvert the treating physicians' opinions that the Plaintiff had a permanent disability which restricted the range of motion in his right ankle.

These physicians, however, to the extent that they found the Plaintiff to be permanently disabled, only did so with respect to his ability to perform the duties of a police officer or detective. (See, e.g., Tr. 193, 197, 199-200). None of them opined as to the Plaintiff's ability to perform the full range of sedentary work prior to December 31, 1991. Indeed, the medical records of the treating physicians support the finding that the Plaintiff was able to perform sedentary work during this time period. For example, in his notes of January 17, 1986, Dr. Klein described the Plaintiff as experiencing "great difficulty running" as a result of pain in his ankle. (Tr. 200). On April 28, 1986, Klein concluded that Plaintiff was "100% disabled as regards his right lower extremity *with respect to activities which necessitate significant amounts of ambulation, prolonged standing, running, etc."* (Tr. 195) (emphasis added). These opinions support the conclusion that Plaintiff was unable to return to his prior position, but express no view as to his ability to sit, stoop, bend or other activities involved in sedentary work. Thus, ALJ Cofresi's findings did not fail to give proper weight to the treating physicians' opinions, but rather credited them as being consistent with one another and other objective medical evidence presented.

The Plaintiff, through his counsel, draws the court's attention to a single opinion of Dr. Gristina as the basis for his claim that the ALJ failed to properly follow the treating physicians rule. The Plaintiff states: "Dr. Gristina, the claimant's treating physician, opined that the

claimant would have permanent restrictions of motion." (Pl.'s Mem. at 8). Although the

Plaintiff provides no citation to the record in connection with this statement, I have reviewed the

entire record at length, and conclude that the Plaintiff must be referencing a note by Dr. Gristina

dated September 5, 1984, in which he wrote that it would "certainly appear from my records, that

this patient has a permanent to partial disability of that [right] ankle with permanent restriction of

range of motion." (Tr. 219). Again, ALJ Cofresi did not discredit Gristina, or any other doctor's

opinion of permanent restriction of range of motion. Crediting this finding, however, does not

undermine the ALJ's ultimate determination, based on substantial evidence, that the Plaintiff

could perform sedentary work.

I find that ALJ Cofresi complied with the treating physicians rule in that he gave great

weight to the opinions of the Plaintiff's treating physicians.

### 3. *The Plaintiff's Credibility*

The Plaintiff also challenges the ALJ's conclusion that he was not credible, arguing that

ALJ Cofresi failed to properly support this credibility finding. (Pl.'s Mem. at 8-9). Cofresi

supported his credibility finding on the following facts: that the Plaintiff's medical treatment was

conservative; that he did not seek medical treatment between 1986 and 1990; that he did not

require hospitalization or surgical intervention between February 1984 and February 1998; that

his medication was not unusual in type or dosage; that there was no indication that his

medication produced side effects; that it "appear[ed]" that the Plaintiff engaged in a range of

daily living activities and was independent in self care; and that he possessed a valid driver's

license and operated a motorcycle during the relevant time period. (Id.).

To the extent that ALJ Cofresi considered the Plaintiff's credibility in reaching a

determination that he was not disabled, "[i]t is the function of the Commissioner, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." <u>Aponte v. Secretary, Dept. of Health and Human Servs</u>, 728 F.2d 588, 591 (2d Cir. 1984) (alteration in original) (quotation omitted). Here, ALJ Cofresi did not totally discount the Plaintiff's subjective claims of pain, but rather found them to be exaggerated in light of the balance of evidence presented. <u>See id.</u> It was within the ALJ's discretion to do so, as his finding is not contradicted by the medical evidence. <u>Rivera v. Schweiker</u>, 717 F.2d 719, 724 (2d Cir. 1983) ("[A]lthough it is clearly permissible for an administrative law judge to evaluate the credibility of an individual's allegations of pain, this independent judgment should be arrived at in light of *all* the evidence regarding the extent of pain.") (emphasis in original). Indeed, although the Plaintiff testified at the March 2004 hearing that he regularly experienced levels of pain in the range of nine out of possible level of ten during the pre-1991 period, he said he was able to sit for forty-five minutes at a time before needing to get up or elevate his leg to relieve swelling. This testimony is not inconsistent with a finding of ability to perform sedentary work.

I am aware that the Second Circuit has "frequently rejected determinations that a person is not disabled based on minimal activities of daily life not engaged in 'for sustained periods comparable to those required to hold a sedentary job.'" <u>Sarchese v. Barnhart</u>, No. 01 Civ. 2172, 2002 WL 1732802, at *8 (E.D.N.Y. July 19, 2002) (Gleeson, J.) (citing <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 643 (2d Cir.1983)). Here, the ALJ considered the entire record, including the Plaintiff's testimony and all of the medical evidence presented, and determined that the record did not support the Plaintiff's claim that his pain was of such severity prior to December 31, 1991 as to preclude him from engaging in substantial gainful activity. In

short, I find that the ALJ's credibility assessment of the Plaintiff complies with the governing regulations and is supported by substantial evidence.  See Kendall v. Apfel, 15 F.Supp. 2d 262, 267 (E.D.N.Y. 1998) (Wexler, J.).

### 4. *Substantial Evidence*

Although I find no error in ALJ Cofresi's application of the treating physicians rule or in his assessment of the Plaintiff's credibility, I am compelled nonetheless to note that this case is complicated by the fact that the Plaintiff's insured period ended on December 31, 1991, almost fifteen years ago.  To sustain his disability claim, it must be found that he was disabled as of that date.  Obviously, fifteen years later, this is not an easy task, particularly in light of the fact that over these fifteen years, the Plaintiff's condition with respect to his right ankle and both of his knees has unquestionably progressively worsened.  That the Plaintiff might currently be disabled, however, or that he might have become disabled at some point subsequent to 1991, does not alter the ALJ's or this court's obligation to evaluate his condition during his insured period.

In affirming ALJ Cofresi's decision, I am mindful of the post-1991 medical evidence in the record that chronicles the Plaintiff's worsening condition since his insured status expired.  It is established in this Circuit that "'a diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment.'" Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (quoting Stark v. Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974)).  The Court of Appeals has explained that "[s]uch a diagnosis must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of a physical impairment prior to [the expiration of insured status]." Id. (internal quotations and citations omitted).

There is, of course, evidence in the record that suggests that as of 1997 or 1998, the Plaintiff's condition had deteriorated such that he may have no longer been able to perform sedentary work. However, although "[a] treating physician's opinion may be applied retroactively to draw conclusions about a claimant's medical condition prior to treatment," such an opinion is "not entitled to the same weight as otherwise would be given if the examination was contemporaneous." Jones v. Heckler, 614 F. Supp. 277, 280 (D. Vt. 1985). That the Plaintiff's condition worsened with time, and that his subsequent injuries were found to be "causally related" to his initial ankle injury, does not change the fact that the contemporaneous medical evidence of the Plaintiff's treating physicians supports the ALJ's determination regarding the Plaintiff's condition as of December 31, 1991. See id. (finding that "even if the treating physicians' opinions were predicated on accepted clinical evidence," those retroactive opinions are not "sufficiently probative of plaintiff's [earlier] medical condition . . . because those opinions are, in fact, internally inconsistent and are contradicted by other medical evidence of record.").

I note, also, that in addition to the medical evidence, the two Residual Physical Functional Capacity Assessments ("RFC") in the record support the determination that the Plaintiff was able to perform sedentary work as of December 31, 1991. (See Tr. 259-74). The first RFC for the Plaintiff's date last insured (i.e. December 1991), which is dated February 14, 1997, finds the Plaintiff experienced the following exertional limits: occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an 8-hour workday; sit (with normal breaks) for a total of about six hours in an 8-hour workday; push and/or pull limited in lower extremities. (Tr.

268).  The second RFC for the relevant time period, which is dated May 13, 1997, reported

exertional limits as follows: occasionally lift and/or carry twenty pounds; frequently lift and/or

carry ten pounds; stand and/or walk (with normal breaks) for a total of about six hours in an 8-

hour workday; sit (with normal breaks) for a total of about six hours in an 8-hour workday; push

and/or pull unlimited.  (Tr. 260).  Although these RFC's are somewhat inconsistent with one

another, both would support a finding that sedentary work was possible as of the Plaintiff's date

of last insured.  <u>See</u> 20 C.F.R. § 416.967(a).[4]

## III.  CONCLUSION

For all of the reasons stated herein, I find the ALJ's decision denying the Plaintiff's social

security disability benefits is supported by substantial evidence.  Accordingly, the Plaintiff's

motion for judgment on the pleadings is denied, and the Commissioner's motion is granted.  The

Clerk of Court is directed to close this case.


SO ORDERED.

Dated: May 9, 2006                                          /s/ Nicholas G. Garaufis
          Brooklyn, N.Y.                                  Nicholas G. Garaufis
                                                         United States District Judge

---

[4]  Sedentary work is defined in the Regulations as follows:
      Sedentary work involves lifting no more than 10 pounds at a time and
      occasionally lifting or carrying articles like docket files, ledgers, and small tools.
      Although a sedentary job is defined as one which involves sitting, a certain
      amount of walking and standing is often necessary in carrying out job duties. Jobs
      are sedentary if walking and standing are required occasionally and other
      sedentary criteria are met.